Oren B. Haker, OSB No. 130162
oren.haker@stoel.com
Bryan T. Glover (admitted *pro hac vice*)
bryan.glover@stoel.com
W. Christopher Pooser (admitted *pro hac vice*)
christopher.pooser@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:  503.220.2480

*Attorneys for Appellant*
*PacifiCorp, dba Pacific Power & Light*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PACIFICORP, dba PACIFIC POWER & LIGHT, | Case No. 6:21-cv-00863-AA |
| Appellant, | APPELLANT'S BRIEF |
| v. | Request for Oral Argument |
| NORTH PACIFIC CANNERS & PACKERS, INC., HERMISTON FOODS, LLC, and NPCP QUINCY, LLC, | |
| Appellees. | |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Bankr. P. 8012, Appellant PacifiCorp, doing business as Pacific Power & Light, states that it is an indirect wholly owned subsidiary of Berkshire Hathaway Energy, a privately held corporation. Berkshire Hathaway, Inc., a publicly held corporation, owns an interest in Berkshire Hathaway Energy in excess of 10 percent.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................v

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................2

STATEMENT OF ISSUES ...........................................................................3

STANDARD OF REVIEW ...........................................................................4

STATEMENT OF THE CASE.......................................................................5

      I.     PacifiCorp generated and supplied electricity to NORPAC, and NORPAC agreed to pay PacifiCorp's rates based on meter readings. ......................................................................................5

      II.    PacifiCorp filed an administrative expense claim under Section 503(b)(9) for the value of the electricity NORPAC received in the 20 days before bankruptcy. ...........................................................7

      III.   The bankruptcy court found electricity is not "goods" because it is consumed before the meter can register and display the amount used........................................................................................8

SUMMARY OF THE ARGUMENT .............................................................10

ARGUMENT .................................................................................................13

      I.     Section 503(b)(9) of the Bankruptcy Code was enacted to encourage trade vendors to extend credit to a debtor on the verge of bankruptcy...........................................................................13

      II.    The bankruptcy court erred in holding that electricity is not "goods" under Section 503(b)(9) based on the ordinary meaning of the term...........................................................................17

# TABLE OF CONTENTS
## (continued)

**Page**

A.    Because "goods" is undefined in the Bankruptcy Code, courts must give the term its ordinary and common meaning. ..................................................................................... 17

B.    The bankruptcy court erred by failing to consider and apply the ordinary meaning of "goods" and by solely applying the definition of "goods" under the UCC. ................ 18

    1.    The bankruptcy court failed to consider and apply the common dictionary meaning of "goods." ................ 19

    2.    The bankruptcy court failed to consider that electricity is considered or characterized as "goods" under numerous areas of law. ........................... 23

        a.    The United States Supreme Court recognized that electricity shares the characteristics of goods in *Utah Power & Light Co. v. Pfost*. ................................................. 23

        b.    Federal law recognizes that electricity is "goods." ............................................................. 25

            i.    Electricity is considered "goods" under the Federal Power Act .................... 26

            ii.    Electricity is considered "goods" under federal antitrust law. ...................... 26

            iii.    Electricity is considered "goods" under federal labor law. ........................... 28

        c.    Electricity is frequently defined as tangible personal property under state tax law ................ 29

111359128.14 0025000-01020

**TABLE OF CONTENTS**
**(continued)**

Page

      d.    The clear majority of products liability cases hold electricity is a product when delivered to a customer. ......................................................31

      e.    A strong majority of non-bankruptcy courts hold that electricity is "goods" under the UCC once it is metered and delivered to the customer. ...........................................................33

      f.    Bankruptcy courts are split on whether electricity is "goods" under the UCC and Section 503(b)(9)..................................................36

    3.    The Court should reverse the bankruptcy court's order for failure to consider and apply the ordinary and common meaning of "goods." ................................40

III.    The bankruptcy court erred in finding electricity is not "goods" under the UCC.................................................................................42

    A.    Electricity is movable and the amount of electricity the customer uses is measured and identified by the meter..........42

    B.    The bankruptcy court incorrectly held that electricity is identified to the contract when it is registered and displayed by the meter. .........................................................43

      1.    Electricity is "goods" because it is "movable at the time of identification to the contract.".........................43

      2.    The bankruptcy court failed to resolve all doubts in favor of identification and follow the UCC's policies to simplify, clarify, and make the law uniform. ......................................................................46

111359128.14 0025000-01020

**TABLE OF CONTENTS**
**(continued)**

**Page**

C.    The bankruptcy court failed to take into account that water and natural gas are considered "goods" under the UCC............................................................................................49

IV.    The bankruptcy court erred in interpreting "goods" under Section 503(b)(9) strictly and narrowly. ...........................................51

CONCLUSION........................................................................................53

CERTIFICATE OF COMPLIANCE.......................................................55

iv

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Arts Dairy, LLC*,
  414 B.R. 219 (Bankr. N.D. Ohio 2009) ............................................................... 15

*In re Ashby Enters., Ltd.*,
  262 B.R. 905 (Bankr. D. Md. 2001) .................................................................... 45

*Baker Botts L.L.P. v. ASARCO LLC*,
  576 U.S. 121 (2015) ............................................................................. 18, 19, 22

*Bank of the W. v. Com. Credit Fin. Servs., Inc.*,
  852 F.2d 1162 (9th Cir. 1988) ........................................................................... 46

*Broad River Power Co. v. Query*,
  288 U.S. 178 (1933) .......................................................................................... 25

*In re Brown & Cole Stores, LLC*,
  375 B.R. 873 (B.A.P. 9th Cir. 2007) ................................................................. 16

*People ex rel. Brush Elec. Mfg. Co. v. Wemple*,
  29 N.E. 808 (N.Y. 1892) ................................................................................... 35

*Bryant v. Tri–Cnty. Elec. Membership Corp.*,
  844 F. Supp. 347 (W.D. Ky. 1994) ....................................................... 32, 33, 36

*In re Christian Life Ctr.*,
  821 F.2d 1370 (9th Cir. 1987) ....................................................................... 4, 14

*In re Cir. City Stores, Inc.*,
  416 B.R. 531 (Bankr. E.D. Va. 2009) ............................................................... 37

*City of Chicago, Ill. v. Fulton*,
  141 S. Ct. 585 (2021) ........................................................................................ 19

*Coast Laundry, Inc. v. Lincoln City*,
  497 P.2d 1224 (Or. Ct. App. 1972) .................................................................... 50

111359128.14 0025000-01020

# TABLE OF AUTHORITIES

**Page**

*In re Curtis*,
571 B.R. 441 (B.A.P. 9th Cir. 2017) ....................................................4

*Dakota Pork Indus. v. City of Huron*,
638 N.W.2d 884 (S.D. 2002) ...............................................................50

*Diamond v. City of Taft*,
215 F.3d 1052 (9th Cir. 2000),
*as amended on denial of reh'g* (July 26, 2000) ....................................4

*In re Erving Indus., Inc.*,
432 B.R. 354 (Bankr. D. Mass. 2010) ............................37, 42, 49, 52

*In re Escalera*,
563 B.R. 336 (Bankr. D. Colo. 2017)...........................................passim

*Farina v. Niagara Mohawk Power Corp.*,
81 A.D.2d 700, 438 N.Y.S.2d 645 (1981)....................................33, 35

*In re First T.D. & Inv., Inc.*,
253 F.3d 520 (9th Cir. 2001) ................................................................4

*GFI Wis., Inc. v. Reedsburg Util. Comm'n*,
440 B.R. 791 (W.D. Wis. 2010) .....................................................passim

*In re Gold Coast Seed Co.*,
30 B.R. 551 (B.A.P. 9th Cir. 1983) .....................................................15

*Golden Spread Elec. Coop. Inc.*,
123 FERC ¶ 61,047 (2008) ..................................................................26

*In re Goody's Fam. Clothing Inc.*,
401 B.R. 131 (Bankr. D. Del. 2009)..............................................16, 22

*In re Great Atl. & Pac. Tea Co.*,
538 B.R. 666 (S.D.N.Y. 2015) ...........................................5, 39, 42, 48

111359128.14 0025000-01020

# TABLE OF AUTHORITIES

**Page**

*In re Grede Foundries, Inc.*,
435 B.R. 593 (Bankr. W.D. Wis. 2010) .......................................................37, 50

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000) ........................................................................................51

*In re Hatton*,
220 F.3d 1057 (9th Cir. 2000) .............................................................20

*In re Hokulani Square, Inc.*,
776 F.3d 1083 (9th Cir. 2015) .............................................................20

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*,
547 U.S. 651 (2006) ...............................................................................52

*Hurt v. Commerce Energy, Inc.*,
973 F.3d 509 (6th Cir. 2020) ...............................................................29

*Lamar v. Micou*,
114 U.S. 218 (1885) ..................................................................................6

*McKay v. Ingleson*,
558 F.3d 888 (9th Cir. 2009) ...............................................................20

*Minn. Power & Light Co.*,
52 F.P.C. 617 (1974) ..............................................................................26

*Minn. Power & Light Co. v. Pers. Prop. Tax, Taxing Dist., City of
Fraser, Sch. Dist. No. 695*,
182 N.W.2d 685 (Minn. 1970) .............................................................30

*In re NE Opco, Inc.*,
501 B.R. 233 (Bankr. D. Del. 2013) ...................................39, 47, 53

*Otte v. Dayton Power & Light Co.*,
523 N.E.2d 835 (Ohio 1988) ....................................................33, 36

# TABLE OF AUTHORITIES

**Page**

*In re Pac. Gas & Elec. Co.*,
  271 B.R. 626 (N.D. Cal. 2002) ............................................................34, 38, 49

*Perrin v. United States*,
  444 U.S. 37 (1979) ............................................................................................18

*In re Pilgrim's Pride Corp.*,
  421 B.R. 231 (Bankr. N.D. Tex. 2009)................................................39, 47, 50

*Powerex Corp. v. Dep't of Revenue*,
  346 P.3d 476 (Or. 2015) ...............................................................21, 30, 31, 36

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)..........................................................................................18

*Ransom v. FIA Card Servs., N.A.*,
  562 U.S. 61 (2011)............................................................................................17

*Ransome v. Wis. Elec. Power Co.*,
  275 N.W.2d 641 (Wis. 1979)...............................................................32, 36, 38

*Rousey v. Jacoway*,
  544 U.S. 320 (2005)..........................................................................................19

*In re S. Mont. Elec. Generation & Transmission Coop., Inc.*,
  No. 11-62031-11, 2013 WL 85162 (Bankr. D. Mont. Jan. 8, 2013)............37, 38

*In re Samaritan All., LLC*,
  No. 07-50735, 2008 WL 2520107 (Bankr. E.D. Ky. 2008) ..............................39

*San Jose Christian Coll. v. City of Morgan Hill*,
  360 F.3d 1024 (9th Cir. 2004) ..........................................................................20

*Schwab v. Reilly*,
  560 U.S. 770 (2010)..........................................................................................19

viii

# TABLE OF AUTHORITIES

**Page**

*In re SK Foods, L.P.*,
676 F.3d 798 (9th Cir. 2012) ...............................................................3

*In re Tacoma Boatbuilding Co.*,
158 B.R. 19 (S.D.N.Y. 1993) ..............................................................44

*Town of Concord, Mass. v. Boston Edison Co.*,
676 F. Supp. 396 (D. Mass. 1988).........................................27, 28, 38

*In re United Educ & Software*,
No. CC-05-1067-MaMeP, 2005 WL 6960237 (B.A.P. 9th Cir.
Oct. 7, 2005) ........................................................................................3

*United States v. Eurodif, S.A.*,
555 U.S. 305 (2009).............................................................................25

*Utah Power & Light v. Pfost*,
286 U.S. 165 (1932)......................................................................passim

*Walling v. Conn. Co.*,
62 F. Supp. 733 (D. Conn. 1945), *aff'd*, 154 F.2d 552
(2d Cir. 1946)......................................................................................29

*Williams v. Duke Energy Int'l, Inc.*,
681 F.3d 788 (6th Cir. 2012) .............................................................27

*In re Wometco de P.R. Inc.*,
No. 15–02264, 2015 WL 1533893 (Bankr. D.P.R. 2016)..................37

*In re World Imports, Ltd.*,
862 F.3d 338 (3d Cir. 2017) ..............................................................17

*Yoby v. Cleveland*,
2020-Ohio-3366, 155 N.E.3d 258 (Ohio Ct. App.)......................35, 36

*Zepp v. Mayor & Council of Athens*,
348 S.E.2d 673 (Ga. Ct. App. 1986)..................................................50

111359128.14 0025000-01020

# TABLE OF AUTHORITIES

**Page**

**Statutes**

11 U.S.C. § 326(a) ..........................................................................................20

11 U.S.C. § 330(a)(1) ......................................................................................19

11 U.S.C. § 362(a)(3) .......................................................................................19

11 U.S.C. § 502(f) ............................................................................................15

11 U.S.C. § 503 ...........................................................................13, 15, 17, 20

11 U.S.C. § 503(b) ...........................................................................14, 22, 30

11 U.S.C. § 503(b)(9).................................................................................passim

11 U.S.C. § 507(a) ...........................................................................................14

11 U.S.C. § 522(d)(10)(E) ..............................................................................19

11 U.S.C. § 523(a)(1) .......................................................................................20

11 U.S.C. § 523(a)(8) .......................................................................................20

11 U.S.C. § 547(c)(4) .......................................................................................15

15 U.S.C. § 13(a) ..............................................................................................26

15 U.S.C. § 14 ...................................................................................................27

28 U.S.C. § 157 ...................................................................................................3

28 U.S.C. § 157(b)(2)(A) ..................................................................................3

28 U.S.C. § 157(b)(2)(B) ..................................................................................3

28 U.S.C. § 157(b)(2)(O) ..................................................................................3

28 U.S.C. § 158(a)(1).........................................................................................3

111359128.14 0025000-01020

# TABLE OF AUTHORITIES

**Page**

28 U.S.C. § 1334 ................................................................................3

28 U.S.C. § 1408 ................................................................................3

28 U.S.C. § 1409 ................................................................................3

29 U.S.C. § 203(i) .............................................................................29

29 U.S.C. § 206 ................................................................................28

29 U.S.C. § 207 ................................................................................28

29 U.S.C. § 212 ................................................................................28

An Act to Establish a Uniform Law on the Subject of Bankruptcies,
    Pub. L. No. 95-598 (HR 8200), 92 Stat. 2549 (1978) .........................13

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,
    Pub. L. No. 109-8, 119 Stat. 23 (2005) ..........................................14

Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq*. ...........................28, 29

Federal Power Act, 16 U.S.C. § 824 *et seq*. ............................................26

Or. Rev. Stat. § 71.1030(1) .................................................................47

Or. Rev. Stat. § 72.1050 .....................................................................34

Or. Rev. Stat. § 72.5010 .....................................................................45

Or. Rev. Stat. § 756.040 ......................................................................5

Or. Rev. Stat. § 756.565 ......................................................................6

Or. Rev. Stat. § 757.020 ....................................................................5, 7

Or. Rev. Stat. § 757.210 ......................................................................5

Or. Rev. Stat. § 757.642 ......................................................................7

# TABLE OF AUTHORITIES

**Page**

Robinson-Patman Act ........................................................................................26, 27

UCC, Article 2 ...........................................................................2, 10, 26, 33

UCC, Article 8 ....................................................................................................34

UCC § 1-103(a).............................................................................................47, 48

UCC § 2-105 ...............................................................................................passim

UCC § 2-105(1) .............................................................................................9, 34

UCC § 2-105, cmt. 1 ...........................................................................................44

UCC, § 2-107 ......................................................................................................50

UCC § 2-501 ......................................................................................................45

UCC § 2-501(1) .............................................................................................45, 48

UCC § 2-501, cmt. 1 ...........................................................................................45

UCC § 2-501, cmt. 2 .....................................................................................45, 46, 48

UCC § 2-501, cmt. 4 ...........................................................................................45

**Rules**

Fed. R. Evid. 201 .................................................................................................6

**Regulations**

29 C.F.R. § 776.20(b) .......................................................................................29

**Constitutional Provisions**

U.S. Const., art. 1, § 8, cl. 4 ...............................................................................13

111359128.14 0025000-01020

# TABLE OF AUTHORITIES

**Page**

**Other Authorities**

I.R.S. Priv. Ltr. Rul. 200152012, 2001 WL 1659979 (Dec. 28, 2001) .................29

3 Sales & Bulk Transfers Under the UCC § 1.03, Lexis (2021) ............................49

*Black's Law Dictionary* (8th ed. 2004).................................................21, 23, 27, 31

4 *Collier On Bankruptcy* ¶ 503.16 (16th ed. 2021) .................................................14

General Rules and Regulations, Rule 10, P.U.C. OR No. 36, Original
    Sheet No. 10-1 (Mar. 19, 2012) .............................................................................6

General Rules and Regulations, Rule 7, P.U.C. OR No. 36, First
    Revised Sheet No. R7-2 at § D (Nov. 5, 2019) .....................................................5

New York City Bar Ass'n, *Made in NY: Electricity* (Mar. 2020) ..........................35

*Oxford English Dictionary* (3d ed. 2000, database updated
    June 2021).............................................................................................................21

Restatement (Second) of Torts § 402A (1965)............................................31, 32, 33

*Webster's New International Dictionary* (2d ed. 1934) ..........................................23

*Webster's Third New International Dictionary* (2002) ...........................................20

**INTRODUCTION**

This appeal asks whether electricity is "goods" under 11 U.S.C. § 503(b)(9) of the United States Bankruptcy Code. Section 503(b)(9) entitles creditors to administrative expense priority for the value of any "goods" received by the debtor in the ordinary course of business 20 days before bankruptcy. PacifiCorp generated and supplied electricity to North Pacific Canners & Packers, Inc. (NORPAC) before NORPAC filed for bankruptcy. PacifiCorp filed a proof of claim seeking administrative priority to $202,937.26, the value of the electricity NORPAC received during the 20 day period. The bankruptcy court denied the claim on the basis that electricity is not "goods" under Section 503(b)(9).

That was error. The term "goods" is not defined in the Bankruptcy Code. But overwhelming authority recognizes that electricity, by its nature, either meets the ordinary and common meaning of "goods" or embodies the characteristics of "goods." As early as 1932, the United States Supreme Court recognized the undeniable nature of electricity: electricity has material substance, can be transmitted from the place of production to the point of use, can be measured such that it can be bought and sold, and is otherwise analogous to traditionally manufactured goods.

There are many other sources that offer guidance into the ordinary meaning of "goods." There are dictionary definitions. There is federal energy, antitrust and

labor law. There is state tax and tort law. There is Article 2 of the Uniform

Commercial Code (UCC). Collectively these authorities agree: electricity is

commonly understood to be goods, tangible personal property, or a consumable

product. Yet, the bankruptcy court considered *only* the UCC definition of "goods"

and then aligned itself with the few non-bankruptcy and bankruptcy courts that

find electricity is not "goods" under the UCC.

PacifiCorp appeals because the bankruptcy court failed to apply or even

consider the ordinary meaning of "goods" as required by basic rules of statutory

construction. But even if the bankruptcy court did not err in that regard, it still

misapplied the UCC definition of "goods" and principles of narrow construction.

The Court should reverse the bankruptcy court and find that PacifiCorp is entitled

to administrative priority for the electricity NORPAC received in the 20 days

before bankruptcy. The Court should further remand this matter for consideration

of the value of that electricity.

## JURISDICTIONAL STATEMENT

In August 2019, NORPAC filed a voluntary petition for relief under Chapter

11 of the Bankruptcy Code. 3-ER-309.[1] On October 21, 2019, PacifiCorp filed a

proof of claim with the bankruptcy court pursuant to Section 503(b)(9). 2-ER-44-

---

[1] PacifiCorp provides excerpts of the record before the bankruptcy court in three volumes entitled "Excerpts of Record." Citations to the Excerpts of Record use the following format: [volume number]-ER-[page number(s)].

111359128.14 0025000-01020

46. NORPAC objected to the claim on August 28, 2020. 2-ER-28-30. The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157 and 1334 because the issues raised by PacifiCorp's proof of claim and NORPAC's objection are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).

On May 11, 2021, the bankruptcy court issued a memorandum opinion concluding that PacifiCorp was not entitled to its Section 503(b)(9) claim. 1-ER-5-19. On May 18, 2021, the bankruptcy court entered an order granting NORPAC's objection. 1-ER-2-3. On June 1, 2021, PacifiCorp appealed the order and elected to have the appeal heard by this Court. 3-ER-299-300. The Court has jurisdiction under 28 U.S.C. § 158(a)(1).

The bankruptcy court's order is a final order because it fully resolves a discrete dispute within NORPAC's larger bankruptcy case. *See In re SK Foods, L.P.*, 676 F.3d 798, 802 (9th Cir. 2012); *In re United Educ & Software*, No. CC-05-1067-MaMeP, 2005 WL 6960237, at *2 n.6 (B.A.P. 9th Cir. Oct. 7, 2005) ("An order disallowing an administrative expense claim is generally a final, appealable order."). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## STATEMENT OF ISSUES

1.      Did the bankruptcy court err in holding that the electricity generated and supplied by PacifiCorp and received by NORPAC was not "goods" for purposes of 11 U.S.C. § 503(b)(9)? This issue includes the following sub-issues:

3

(a)    Did the bankruptcy court err in failing to consider and apply the ordinary and common meaning of "goods" and in considering only the UCC definition of "goods"?

(b)    Did the bankruptcy court err in applying the UCC definition of "goods" and in determining that electricity is not movable at the time of identification to the contract?

(c)    Did the bankruptcy court err in holding that "goods" as used in Section 503(b)(9) should be narrowly and strictly interpreted?

## STANDARD OF REVIEW

The district court reviews the bankruptcy court's legal conclusions de novo and its factual determinations for clear error. *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 526 (9th Cir. 2001). Questions of statutory interpretation, such as the interpretation of Section 503(b)(9), are questions of law reviewed de novo. *See In re Christian Life Ctr.*, 821 F.2d 1370, 1373-74 (9th Cir. 1987). "De novo means review is independent, with no deference given to the trial court's conclusion." *In re Curtis*, 571 B.R. 441, 444 (B.A.P. 9th Cir. 2017) (citation omitted).

Mixed questions of fact and law are also subject to de novo review. *Diamond v. City of Taft*, 215 F.3d 1052, 1055 (9th Cir. 2000), *as amended on denial of reh'g* (July 26, 2000). Thus, under any scenario, the Court reviews the bankruptcy court's order granting NORPAC's objection de novo. *See GFI Wis.,*

*Inc. v. Reedsburg Util. Comm'n*, 440 B.R. 791, 798 (W.D. Wis. 2010) (finding the

question of whether electricity qualifies as "goods" under Section 503(b)(9) is a

question of law subject to de novo review); *In re Great Atl. & Pac. Tea Co.*, 538

B.R. 666, 670 (S.D.N.Y. 2015) (same).

## STATEMENT OF THE CASE

**I.    PacifiCorp generated and supplied electricity to NORPAC, and NORPAC agreed to pay PacifiCorp's rates based on meter readings.**

NORPAC is a processor of frozen vegetables and fruits that owns and

operates a raw processing plants in Stayton, Oregon. 2-ER-32-33 (¶ 5). Electricity

is critical to NORPAC's operations, *see* 2-ER-34 (¶ 11), and NORPAC is a

customer of PacifiCorp, *see* 2-ER-25, 151 (¶ 17). PacifiCorp is a public utility that

generates and sells electricity to customers in Oregon. 2-ER-148 (¶ 6).

Each state regulates electricity differently, and Oregon law and the Oregon

Public Utility Commission (OPUC) govern PacifiCorp's sale and delivery of

electricity and billing practices. 2-ER-148 (¶ 7); *see also* Or. Rev. Stat. § (O.R.S.)

756.040. As a public utility, PacifiCorp is obligated to provide safe service at

reasonable rates to customers in its service area. *See* O.R.S. 757.020. OPUC

reviews and approves PacifiCorp's rate schedules (which are also called "tariffs").

*See* O.R.S. 756.040; O.R.S. 757.210.

PacifiCorp's charges for electricity are based on meter readings in the

manner specified in OPUC rate schedules. *See* 2-ER-151-53 (¶¶ 17-23); General

Rules and Regulations, Rule 7, P.U.C. OR No. 36, First Revised Sheet No. R7-2 at § D (Nov. 5, 2019).[2] The essential function of meters is to measure the amount of electricity delivered to and used by the customer. 2-ER-152 (¶ 21). Meters measure electricity in terms of kilowatt-hours and are read at least each month. 2-ER-152-53 (¶¶ 22-23). PacifiCorp's customers agree to the rates and charges based on meter reading. *See* General Rules and Regulations, Rule 10, P.U.C. OR No. 36, Original Sheet No. 10-1 (Mar. 19, 2012); 2-ER-151-53 (¶¶ 17-23), 264-70.[3]

PacifiCorp supplied electricity to NORPAC in the 20-days before its bankruptcy through two accounts related to seven meters located at its Stayton, Oregon plant. 2-ER-151 (¶ 18), 184-85 (¶¶ 9-12). Each of NORPAC's meters measured and recorded the amount of electricity received, as required to determine the appropriate charges per the applicable rate schedules. *See* 2-ER-184 (¶ 10). PacifiCorp supplied electricity to NORPAC pursuant to OPUC Schedules 28, 41, and 48. 2-ER-151-52 (¶¶ 19-20); *see also* 2-ER-47, 81-89.

---

[2] <u>Pacific Power, General Rules and Regulations - Basis of Rates, Rule 7 (Nov. 5, 2019)</u>. OPUC's rules are publicly available and have the force of law. *See* O.R.S. 756.565. Technically a court does not need to take judicial notice of the existence of a law. *See Lamar v. Micou*, 114 U.S. 218, 223 (1885). Even so, to be sure, PacifiCorp requests that the Court take judicial notice of the existence of the OPUC rules cited herein. *See* Fed. R. Evid. 201.

[3] <u>Pacific Power, General Rules and Regulations - Billing, Rule 10 (Dec. 30, 2014)</u>.

II.    **PacifiCorp filed an administrative expense claim under Section 503(b)(9) for the value of the electricity NORPAC received in the 20 days before bankruptcy.**

PacifiCorp generated and delivered electricity to NORPAC leading up to its Chapter 11 filing on August 22, 2019, and through April 2020. 2-ER-145 (¶ 5). PacifiCorp filed a proof of claim that included a Section 503(b)(9) administrative expense claim for $206,009.81, the value of the electricity supplied to NORPAC during the 20-day period preceding the petition date. 2-ER-46-48. PacifiCorp later reduced the claim to $202,937.26. 2-ER-104-05.

To calculate its Section 503(b)(9) administrative claim, PacifiCorp first retrieved data from NORPAC's meters and determined the charges that accrued during the 20-day period. 2-ER-192-93 (¶¶ 38-40). Under Oregon law, rates for electricity are unbundled, which means invoices must show separate line items representing charges based on the electricity received by the customer.[4] *See* O.R.S. § 757.642; 2-ER-149 (¶ 10). These separate line items all fall within the scope of the purchase price of the electricity and are driven by and based on the amount of electricity received and used by the customer. *See* 2-ER-149 (¶ 10).

---

[4] OPUC uses the word "service" to refer to the delivery of water, natural gas, and electricity by Oregon utilities to customers, and in each case the "service" ultimately provided is a thing: either water, natural gas, or electricity. *See* O.R.S. 757.020. OPUC rate schedules and PacifiCorp's invoices also use the word "service." *See*, *e.g.*, 2-ER-264-65. The bankruptcy court properly held that labels cannot change the true nature of a transaction. 1-ER-10-11 n.9.

The invoices for NORPAC's accounts include line-item charges for the generation, transmission, distribution, and delivery of electricity. *See*, *e.g.*, 2-ER-55-58. PacifiCorp reviewed each line-item charge to determine whether it was related to or attributable to the electricity received by NORPAC. 2-ER-186-204 (¶¶ 20-53) (explaining review process). Only charges related to the delivery and consumption of electricity are included in the claim, as calculated in accordance with the applicable OPUC rate schedule (28, 41, or 48) and by reference to the number of kilowatt hours NORPAC used. *See* 2-ER-192-204 (¶¶ 38-53).

NORPAC objected to PacifiCorp's administrative claim, asserting that "electricity service is not a good within the meaning of Section 503(b)(9) and is therefore not entitled to priority treatment." 2-ER-30. The bankruptcy court heard NORPAC's objection in January 2021, *see* 2-ER-101, and issued a memorandum opinion and an order granting the objection in May 2021, 1-ER-2-19. According to the bankruptcy court, electricity is not "goods" for purposes of Section 503(b)(9) because it does not meet the definition of "goods" under the UCC. 1-ER-5-19.

### III.    The bankruptcy court found electricity is not "goods" because it is consumed before the meter can register and display the amount used.

At the hearing, PacifiCorp submitted the expert testimony of Dr. Shawn Kolitch. *See* 2-ER-206, 251. NORPAC submitted expert testimony from Dr. Howard A. Scott. *See* 2-ER-107. Both experts addressed the nature of electricity, and for the most part they agreed. As the bankruptcy court acknowledged, Dr.

8

Kolitch and Dr. Scott agreed that PacifiCorp provided NORPAC with electricity that moves close through wires in response to the demand of NORPAC's electric-powered devices. 1-ER-11-12. They also agreed that meters measure and record the amount of electricity that passes through them and the amount a customer uses and is required to pay. 1-ER-12.

Nonetheless, Dr. Kolitch and Dr. Scott disagreed on "whether the electricity provided to Debtor was movable at the time it was identified to the contract of sale." 1-ER-12. This became a crucial point as the bankruptcy court focused solely on the UCC definition of "goods": "all things … which are movable at the time of identification to the contract for sale." 1-ER-11 (quoting UCC § 2-105(1)). According to Dr. Scott, meters cannot measure the amount of electricity used before that electricity is consumed because it travels at almost 186,000 miles per second, whereas meters operate at a slower speed. 2-ER-125. Once the electricity passes through the meter, the customer typically consumes it in 226 nanoseconds, while the meter measures the electricity milliseconds later. 2-ER-129.

Based on Dr. Scott's testimony, the bankruptcy court found that the electricity PacifiCorp supplied NORPAC was not "moveable at the time of identification to the contract for sale," as required by the UCC. 1-ER-12-18. The bankruptcy court reasoned that identification happens when the meter "registers and displays" the amount of electricity used. 1-ER-12. And because electricity

travels near the speed of light and is consumed before the meter is capable of registering and displaying the amount used, it is no longer moveable when it is identified to the contract. 1-ER-12-15.

For the purposes of appeal, PacifiCorp does not dispute the finding that electricity is consumed before the meter can register and display the amount used. Rather PacifiCorp challenges the bankruptcy court's interpretation of the term "goods" under Section 503(b)(9), as well as its conclusion that identification to the contract under the UCC occurs when the meter registers and displays the amount of electricity used.

## SUMMARY OF THE ARGUMENT

Considering only the definition of "goods" under Article 2 of the UCC, the bankruptcy court held that electricity is not "goods" under Section 503(b)(9). The bankruptcy court also held that principles of narrow construction supported its holding. The bankruptcy court's error can be shown three ways.

First, the bankruptcy court failed to consider and apply the ordinary meaning of "goods." The term "goods" is not defined in Section 503(b)(9) or elsewhere in the Bankruptcy Code, and there is no binding precedent on its meaning. Rules of statutory construction require the courts to start with the ordinary and common meaning of undefined terms. But here, in a quest for uniform application of Section 503(b)(9), the bankruptcy court jumped solely to the UCC definition of "goods."

The result, though, was far from uniform. Bankruptcy courts are now equally divided on whether electricity is "goods" under Section 503(b)(9) and the UCC.

Half of these bankruptcy courts engage in an analysis based on the nature of electricity. These courts recognize that electricity is moved from place of production to place of use, that the meter measures the amounts the customer uses and agrees to pay, that electricity is measured by a well-recognized unit of sale, and that electricity shares the traits of any good or consumable product bought and sold in the marketplace. These courts find electricity is identified to the contract when it passes through the meter.

The other half of bankruptcy courts have engaged in an analysis that does not turn on the nature of electricity but on the nature of the meter and how fast the meter can measure the amount of electricity being used. Because meters cannot, given current technology, immediately register and display the amount of electricity being used by the customer before it is consumed, these courts find the millisecond delay between the measurement and use of electricity means it is no longer movable when identified to the contract and thus is not "goods."

In aligning itself with that view, the bankruptcy court erred. Had the bankruptcy court started with the ordinary and common meaning of "goods," it would have found that electricity fits within the term's dictionary meaning: it is tangible and movable property produced for sale. The bankruptcy court would

11

have also found that electricity is considered "goods" under federal energy, antirust, and labor law, is treated as tangible personal property for tax purposes, is considered a product by a clear majority of products liability cases, and has been found to be "goods" under the UCC by strong majority of non-bankruptcy courts. It is incongruous to hold electricity falls within the meaning "goods" under those authorities but is not "goods" for purposes of Section 503(b)(9).

Second, even if the bankruptcy court did not err in failing to apply the ordinary and common meaning of "goods," the bankruptcy court misapplied the UCC definition and what it means to be "movable at the time of identification to the contract." In aligning itself with the decidedly minority view, the bankruptcy court found that identification occurs when the amount of electricity passing through the meter is registered and displayed on the meter.

In its dissection of the speed at which meters measure electricity, the bankruptcy court lost sight of the fact that the UCC definition of "goods" is based on the concept of movability and that the parties themselves can agree to the manner of identifying goods to the contract. Moreover, the UCC instructs that all doubts should be resolved in favor of identification. Not only did the bankruptcy court fail to achieve uniformity in the application of Section 503(b)(9), it also failed to engage in a common sense, practical analysis that promotes the UCC's policies of liberal construction, simplicity, clarity, and uniformity.

Third, the bankruptcy court erred when it narrowly construed "goods" under Section 503(b)(9). Narrow construction principles apply when it is "far from clear" that the asserted priority fits within the statute. That, as explained, is not the situation here, as overwhelming authority recognizes that electricity plainly fits within the ordinary meaning of "goods." In addition, having chosen the UCC definition of "goods," the bankruptcy court necessarily adopted the UCC's policies of liberal construction and flexibility but did not apply them. The bankruptcy court narrowly construed the UCC definition too, which does not call for such treatment.

The Court should reverse the bankruptcy court's decision, find that PacifiCorp is entitled to administrative priority for the $202,937.26 in the electricity it supplied to NORPAC 20 days before bankruptcy, and remand this matter for consideration of the value of the electricity NORPAC received.

## ARGUMENT

**I.    Section 503(b)(9) of the Bankruptcy Code was enacted to encourage trade vendors to extend credit to a debtor on the verge of bankruptcy.**

Under the United States Constitution, Congress is charged with establishing uniform bankruptcy laws throughout the United States. *See* U.S. Const., art. 1, § 8, cl. 4 ("The Congress shall have power to … establish … uniform laws on the subject of bankruptcies throughout the United States."). In 1978, Congress enacted Section 503 to provide for the allowance of administrative expenses necessary to preserve the value of the bankruptcy estate. *See* An Act to Establish a Uniform

Law on the Subject of Bankruptcies, Pub. L. No. 95-598 (HR 8200), 92 Stat. 2549 (1978). Administrative expense claims are entitled to the highest priority in distribution of the assets of the estate after the payment of secured claims and super priority claims. *See* 11 U.S.C. § 507(a).

Section 503(b) provides a non-exhaustive list of possible administrative expenses. When first enacted, the statute mostly allowed administrative priority for many expenses incurred *after* the bankruptcy petition was filed. *See* 4 *Collier On Bankruptcy* ¶ 503.16 (16th ed. 2021) ("Before the enactment of section 503(b)(9), only a few obligations incurred before commencement of the case could qualify for administrative expense priority … almost all administrative expenses were postpetition obligations."). The policy behind granting priority to administrative expenses is that "the estate as a whole is benefited if general creditors subordinate their pre-bankruptcy claims in order to secure goods and services necessary to an orderly and economical administration of the estate after the petition is filed." *Christian Life Ctr.*, 821 F.2d at 1373-74 (citation omitted).

Then in 2005, Congress added Section 503(b)(9). *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005). By enacting the provision, Congress elevated certain pre-petition debts owed to suppliers of "goods" to administrative priority. Section 503(b)(9) reads:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under

14

> section 502(f) of this title, including– …

> > (9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9). Adding the provision, "Congress *expanded* the category of administrative expense claims to include the value of 'goods' received by the Debtor shortly before the bankruptcy filing. So, the measure obviously was designed to provide additional redress for creditors—not debtors." *In re Escalera*, 563 B.R. 336, 346 (Bankr. D. Colo. 2017) (emphasis in original).

Section 503(b)(9) also expands the policy underlying Section 503 by encouraging trade vendors—who would otherwise be reluctant—to provide goods on an unsecured basis to troubled companies on the verge of bankruptcy.[5] *See In re Arts Dairy, LLC*, 414 B.R. 219, 220 (Bankr. N.D. Ohio 2009) (explaining that a primary goal of Section 503(b)(9) is to "encourage trade creditors to continue to extend credit to a debtor potentially heading for bankruptcy"). Another goal of the

---

[5] Just like Section 547(c)(4) of the Bankruptcy Code attempts to provide an incentive for creditors to continue to supply goods to distressed companies by affording creditors the subsequent "new value" defense to any preferential transfer action, Section 503(b)(9) seeks to accomplish the same goal by affording administrative priority treatment to those who have sold goods to the debtor on credit immediately *before* the bankruptcy was filed. *See In re Gold Coast Seed Co.*, 30 B.R. 551, 553 (B.A.P. 9th Cir. 1983) ("The purpose of § 547(c)(4) is precisely to encourage trade creditors to continue dealing with troubled businesses.").

provision is to "discourage abuse by debtors who seek to acquire goods at a time when it is known that bankruptcy is imminent and that payment for the goods will not have to be tendered." *Id.*; *see also GFI Wis.*, 440 B.R. at 797-98.

Notably, Congress only expanded administrative priority to suppliers of goods, as opposed to service providers. The terms "goods" and "services" are disjunctively connected throughout the Bankruptcy Code and must be ascribed separate meanings. *In re Goody's Fam. Clothing Inc.*, 401 B.R. 131, 135 (Bankr. D. Del. 2009). Thus, as Section 503(b)(9) is limited solely to "goods," "goods" cannot include "services." *See id.*; *see also In re Brown & Cole Stores, LLC*, 375 B.R. 873, 878 n.7 (B.A.P. 9th Cir. 2007) ("By the plain terms of the statute … the vendor must have provided goods (not services).").

By providing critical suppliers of goods administrative priority for the value of goods received by a debtor in the ordinary course of business within the 20-day period, Congress encouraged these vendors to support troubled businesses in the run-up to bankruptcy. In effect, Congress determined that the benefits associated with vendors continuing to do business with distressed businesses outweigh any drawbacks associated with requiring the debtor to pay its Section 503(b)(9) creditors in full as a condition to confirming a plan of reorganization.

The bankruptcy court's holding that electricity is not "goods" does not align with the purposes of Section 503(b)(9).

II.     **The bankruptcy court erred in holding that electricity is not "goods" under Section 503(b)(9) based on the ordinary meaning of the term.**

    A.     **Because "goods" is undefined in the Bankruptcy Code, courts must give the term its ordinary and common meaning.**

Under Section 503(b)(9), it was PacifiCorp's burden to prove that (1) it sold "goods" to the debtor, (2) the goods were received by the debtor within 20 days before the petition date, and (3) the goods were sold in the ordinary course of the debtor's business. *In re World Imports, Ltd.*, 862 F.3d 338, 341 (3d Cir. 2017). Before the hearing, the parties stipulated that NORPAC received electricity from PacifiCorp in the ordinary course of business 20 days before filing for bankruptcy. 2-ER-25 (¶¶ 2-3).

Thus the case before the bankruptcy court turned on whether the electricity NORPAC purchased from PacifiCorp qualifies as "goods" within the meaning of Section 503(b)(9). 1-ER-10. The term, however, is not defined in Section 503 or anywhere in the Bankruptcy Code. Nor is there binding precedent from the United States Supreme Court or any circuit court concerning how "goods" should be defined under the statute.[6] It follows that the interpretation of Section 503(b)(9) begins with the text and context of the statute. *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011).

---

[6] In addition, there is no legislative history explaining Congress's intent in using the word "goods" in Section 503(b)(9). *See Escalera*, 563 B.R. at 347.

111359128.14 0025000-01020

Undefined words "will be interpreted as taking their ordinary, contemporary, common meaning," *Perrin v. United States*, 444 U.S. 37, 42 (1979), as understood at the time of the statute's enactment, *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 128 n.2 (2015). It is the courts' "obligation to interpret the Code clearly and predictably using well established principles of statutory construction." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012).

**B.    The bankruptcy court erred by failing to consider and apply the ordinary meaning of "goods" and by solely applying the definition of "goods" under the UCC.**

The bankruptcy court did not consider or give any weight to the ordinary and common meaning of "goods" as used in Section 503(b)(9). Rather it considered only one definition—the legal definition of "goods" under Article 2 of the UCC. 1-ER-11-18. That was error. Nothing in the Bankruptcy Code says the courts should consider the UCC, or only the UCC, when determining whether the thing provided in the ordinary course of the debtor's business is "goods" for purposes of Section 503(b)(9).

While courts may consult the UCC definition of "goods" as part of a broader search for plain meaning, the bankruptcy court did not have license to ignore the ordinary meaning of "goods" or consider *only* the UCC to the exclusion of all other sources defining the term. If the bankruptcy court had fulfilled its charge to find and apply the ordinary meaning of "goods," it would have found that

overwhelming authority holds that electricity fits within the meaning of the term.

As a recent bankruptcy court observed, "goods" is an extremely broad term and the

use of the word in Section 503(b)(9) does not suggest that the courts should impose

their own limits where Congress did not. *Escalera*, 563 B.R. at 348.

The *Escalera* court conducted an exhaustive search into the ordinary and

common meaning of "goods," consulting, among other things, dictionaries, federal

statutes, tax law, tort law, and the UCC, concluding that "virtually all of such

sources point in the same direction": electricity "plainly falls within the scope of

the term." *Id*. at 348, 370.

### 1.    The bankruptcy court failed to consider and apply the common dictionary meaning of "goods."

Courts may look to dictionaries to determine the meaning of terms the

Bankruptcy Code does not define. *Schwab v. Reilly*, 560 U.S. 770, 783 (2010). The

United States Supreme Court routinely does. For example, in *Rousey v. Jacoway*,

544 U.S. 320, 321 (2005), the Supreme Court consulted dictionaries for the

ordinary meaning of the terms "on account of," "similar," "profitsharing," "stock

bonus," "pension," and "annuity" under Section 522(d)(10)(E). In *Baker Botts*, the

Court looked to dictionaries to discern the ordinary meaning of "services" under

Section 330(a)(1). *See* 576 U.S. at 128. And just earlier this year, the Court used

dictionaries to define "act" and "exercise" under Section 362(a)(3). *See City of

Chicago, Ill. v. Fulton*, 141 S. Ct. 585, 590 (2021).

The Ninth Circuit also consults dictionaries when attempting to discern the meaning of undefined terms in the Bankruptcy Code. *See generally San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) ("To determine the 'plain meaning' of a term undefined by a statute, resort to a dictionary is permissible."). Thus, for example, in *McKay v. Ingleson*, 558 F.3d 888, 889-90 (9th Cir. 2009), the Court used dictionary definitions to determine the ordinary meaning of "loan" under Section 523(a)(8)). In *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1085-86 (9th Cir. 2015), the Court used dictionaries to define "moneys" and "disburse" under Section 326(a). There are many other examples.[7]

Dictionary definitions of "goods" at the time Section 503 was enacted reveal the term is extremely broad and has a common usage. *Escalera*, 563 B.R. at 348.

- One commonly-used dictionary defines "goods" as "tangible movable personal property having intrinsic value usu. excluding money and other choses in action but sometimes including all personal property." *Webster's Third New International Dictionary* 978 (2002).

- Another defines "goods" as "[t]hings that are produced for sale; commodities and manufactured items to be bought and sold; merchandise, wares" or "economic assets which have a tangible, physical

---

[7] *See, e.g., In re Hatton*, 220 F.3d 1057, 1060 (9th Cir. 2000) (looking "no further than Webster's dictionary" to evaluate the meaning of "return" under Section 523(a)(1)).

form (contrasted with services)." *Goods*, *Oxford English Dictionary* (3d ed. 2000, database updated June 2021), https://www.oed.com.

- Similarly, *Black's Law Dictionary* defines "goods," as "tangible or movable personal property other than money; esp., articles of trade or items of merchandise" or "[t]hings that have value, whether tangible or not." *Black's Law Dictionary* 714 (8th ed. 2004).

No matter the definition, the dictionary meaning of "goods" means "tangible movable personal property having intrinsic value," "things that are produced for sale," "tangible or movable personal property," and "things that have value, whether tangible or not." *See also Escalera*, 563 B.R. at 349. Electricity fits within those meanings. It is tangible. As the *Escalera* court explained, "[t]o the extent that tangibility is a requisite for 'goods' under some (but not all) dictionary definitions, electrical energy is tangible. It exists. … the tangibility of electrical energy is confirmed by numerous legal sources." *Id*.

Electricity is also tangible personal property. *See Powerex Corp. v. Dep't of Revenue*, 346 P.3d 476 (Or. 2015) (holding that electricity is "tangible personal property" for purposes of an Oregon income tax law). Electricity has value and is produced for sale, as demonstrated by OPUC's rate schedules, PacifiCorp's generation of electricity for sale, NORPAC's request for and use of electricity, and the value of the electricity NORPAC purchased. *See* 2-ER-147-62.

Electricity is movable. *See Escalera*, 563 B.R. at 354-55; *GFI Wis.*, 440 B.R. at 800 (agreeing with the courts concluding that electricity is movable, tangible, and consumable). In particular, electricity can be measured as it moves through the meter. As the bankruptcy court noted, "[t]he parties agree that meters measure and record the amount of electricity passing through the meter, and the amount a customer will be required to pay for that electricity." 1-ER-12. Also: "according to both parties, electricity moves at close to the speed of light." *Id*.

It follows that electricity fits squarely within the ordinary dictionary meaning of "goods." As the *Escalera* court observed, "on a common sense basis, there really can be no doubt electrical energy falls within the ambit of 'goods' under typical usage definitions. In fact, the question is not even close." 563 B.R. at 349. The ordinary meaning of "goods" requires only an examination of electricity itself, which is the same whether it is generated and delivered to a customer in Oregon or in New York. It does not depend on how fast the meter measures the amount of electricity the customer requested and consumed.

In holding otherwise, the bankruptcy court also failed to consider statutory context. "Goods" and "services," as noted, have different meanings under Section 503(b). *See Goody's Family Clothing*, 401 B.R. at 135 ("'goods' cannot include services"). That distinction is important. In *Baker Botts*, the Supreme Court held that "services" "ordinarily refers to 'labor performed for another.'" 576 U.S. at 128

22

(quoting *Webster's New International Dictionary* 2288 (def. 4) (2d ed. 1934)).

*Black's Law Dictionary* likewise defines a "service" as "an intangible commodity in the form of human effort, such as labor, skill, or advice." *Black's Law Dictionary* 1399 (8th ed. 2004).

PacifiCorp did not claim administrative priority for the value of labor performed on behalf of NORPAC in the 20 days before it filed for bankruptcy. *See* 2-ER-44-48. Rather PacifiCorp generated and delivered electricity to NORPAC to run its processing plant, which was crucial to its operations. *See id.*; 2-ER-34 (¶ 11). Because the electricity supplied to NORPAC does not meet the commonly understood definition of "services," this is further evidence that electricity is "goods" under the ordinary and common usage of the term.

The bankruptcy court erred when it failed to look for, consider, and apply the ordinary meaning of "goods" within the context of Section 503(b)(9). Given its plan and ordinary usage, electricity fits within the meaning of "goods."

> ### 2. The bankruptcy court failed to consider that electricity is considered or characterized as "goods" under numerous areas of law.
>
> #### a. The United States Supreme Court recognized that electricity shares the characteristics of goods in *Utah Power & Light Co. v. Pfost*.

Many courts have found that electricity aligns with the ordinary meaning of "goods." That includes the United States Supreme Court. In *Utah Power & Light v.*

*Pfost*, 286 U.S. 165, 175-83 (1932), the Supreme Court analogized electricity to

"goods" in a dispute concerned with whether a tax on the production of electricity

burdened interstate commerce. Notably, the Supreme Court chose not to engage in

a hyper-technical scientific analysis but one of common sense: "From the strictly

scientific point of view, the subject is highly technical; but in considering the case,

we must not lose sight of the fact that taxation is a practical matter, and that what

constitutes commerce, manufacture, or production is to be determined upon

practical considerations." *Id*. at 179.

While the Supreme Court acknowledged that the analogy between electricity

and other goods is often difficult to perceive because electricity cannot be bought

and sold in pounds or gallons, the Court also recognized that electricity "has actual

content" and can be measured for purposes of barter, sale, and exchange:

> *it is susceptible of mechanical measurement with the necessary certainty to permit quantitative units to be fixed for purposes of barter, sale, and exchange. However lacking it may be in body or substance, electrical energy, nevertheless, possesses many of the ordinary tokens of materiality*. It is subject to known laws; manifests definite and predictable characteristics; may be transmitted from the place of production to the point of use and there made to serve many of the practical needs of life.

*Id.* at 180 (emphasis added). The Supreme Court likened the generation of

electricity as a response "to what in effect is an order" from a customer, followed

by "production as well as transmission of a definite supply of an article of trade.

24

*The manufacture to order of goods and their immediate shipment to the purchaser furnishes a helpful analogy*." *Id.* (emphasis added).

Thus the Supreme Court found that electricity is "a distinct product" that is "brought into being and transmitted to the places of use." *Id.* at 179; *see also Broad River Power Co. v. Query*, 288 U.S. 178, 180-81 (1933) ("Notwithstanding the special characteristics of electrical energy, the company is engaged in producing and selling an article of trade. The product is property."). The fact that electricity is bought and sold and is fungible also suggests it is "goods." *See United States v. Eurodif, S.A.*, 555 U.S. 305, 319-20 (2009) (explaining that a transaction involving a fungible product is more likely to be viewed as the sale of a good as opposed to the sale of a service).

The Supreme Court's common sense approach aligns perfectly with the accepted and ordinary dictionary definitions of "goods."

        **b.**       **Federal law recognizes that electricity is "goods."**

As noted, *Escalera* carefully examined other sources of law in search of the ordinary and common meaning of "goods," including federal energy, antitrust, and labor law. 563 B.R. at 360-64, 367-369. In each area, the *Escalera* court found that electricity is considered and treated as "goods," not services. *See id*.

111359128.14 0025000-01020

### i.    Electricity is considered "goods" under the Federal Power Act.

Under the Federal Power Act, the Federal Energy Regulatory Commission (FERC) regulates the interstate transmission and sale of electricity. *See* 16 U.S.C. § 824 *et seq*. FERC and its predecessor have consistently held that Article 2 of the UCC applies to contracts for the interstate sale of electricity under the Federal Power Act. *See, e.g.*, *Golden Spread Elec. Coop. Inc.*, 123 FERC ¶ 61,047, 61,620 n.273 (2008) (applying Article 2 to settlement agreement related to sale of electricity); *Minn. Power & Light Co.*, 52 F.P.C. 617, 619 (1974) (holding that Article 2 applies to the "interpretation of contracts for the sale of electric power"). Because FERC has held that electricity sale contracts are governed by the UCC, it has determined that electricity is "goods" in the realm of federal energy law.

### ii.    Electricity is considered "goods" under federal antitrust law.

Federal antitrust cases under the Robinson-Patman Act also "provide insightful guidance … concerning the commonly accepted legal meaning of the term 'goods.'" *Escalera*, 563 B.R. at 360. Section 2(a) of the law prohibits "any person engaged in commerce" from discriminating "in price between different purchasers of *commodities* of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 13(a) (emphasis added). Section 3 makes it unlawful for

26

any person engaged in commerce "to lease or make a sale or contract for sale of *goods*, wares, merchandise, machinery, supplies, or *other commodities*" if such agreement restrains the lessee or purchaser from dealing with competing sellers. 15 U.S.C. § 14 (emphases added).

In this context, "commodities" and "goods" are commonly understood to be one and the same. *See Town of Concord, Mass. v. Boston Edison Co.*, 676 F. Supp. 396, 397 (D. Mass. 1988) ("The term 'commodity' is commonly used to refer to goods, merchandise, wares, supplies and other items bought and sold in the marketplace."); *Black's Law Dictionary* 291 (8th ed. 2004) (defining "commodity" as "[a]n article of trade or commerce. The term embraces only tangible goods, such as products or merchandise, as distinguished from services.") And a clear majority of courts have concluded that electricity is a commodity under the Robinson-Patman Act. *See Escalera*, 563 B.R. at 360-62 (collecting and analyzing cases); *see also Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 800 (6th Cir. 2012) (reaffirming that electricity is a commodity under the statute).

These cases do not refer to the UCC definition of "goods" but instead focus on "a more common sense and plain-meaning approach." *See Escalera*, 563 B.R. at 362. For example, echoing the findings of *Utah Power & Light*, the court in *Town of Concord* explained why electricity is a commodity, and thus a good, under the Robinson-Patman Act:

> [E]lectricity is not significantly different from other items deemed commodities subject to the price discrimination prohibitions of the antitrust laws. *Like the more traditional com[m]odities, electrical energy is a thing bought and sold in the market place. It may be measured, stored and even stolen*.

676 F. Supp. at 398 (emphasis added). Then the court addressed the fact that

electricity is manufactured and distributed:

> More importantly, *electricity is manufactured from other forms of energy and then distributed from the manufacturer to intermediaries like the plaintiffs or to the ultimate consumers at retail*. Like other commodities, electricity is useful to purchasers solely because of its physical properties and not because it represents any underlying contractual right or other intangible.

*Id*. (emphasis added). The court concluded that an electric utility "manufactures

electricity and sells it to consumers at retail and at wholesale. The primary purpose

of a consumer who deals with [the electric utility] is to obtain this product,

electricity. … The manufacture and sale of electricity is no more a service than the

manufacture and sale of widgets." *Id*.

### iii. Electricity is considered "goods" under federal labor law.

Electricity is also considered "goods" under federal labor law. *See Escalera*,

562 B.R. at 362-63. Various provisions of the Fair Labor Standards Act of 1938,

29 U.S.C. § 201 *et seq*. (FLSA) refer to "goods" in the context of minimum wage,

maximum hour, and child labor laws. *See, e.g.*, 29 U.S.C. §§ 206, 207, 212. Under

the FLSA, "goods" are defined as "goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character." 29 U.S.C. § 203(i).

The Department of Labor administers the FLSA and has expressly determined in its regulations that "[g]oods includes … electrical energy or power[.]" 29 C.F.R. § 776.20(b). Courts have followed suit, with the result that electricity is commonly understood to be "goods" in the context of federal labor law. *See Walling v. Conn. Co.*, 62 F. Supp. 733, 734 (D. Conn. 1945) (equating electric current with "goods"), *aff'd*, 154 F.2d 552 (2d Cir. 1946); *Hurt v. Commerce Energy, Inc.*, 973 F.3d 509, 521 (6th Cir. 2020) (holding that door-to-door contracts for the sale of electricity were contracts for the sale of "commodities"—not "services"—for the purposes of the FLSA).

### c.    Electricity is frequently defined as tangible personal property under state tax law.

Many states have decided that electricity is "tangible personal property" under tax law. The *Escalera* court noted that "[a]t least 22 states expressly define 'electricity' as 'tangible personal property' in connection with state taxation." 563 B.R. at 366 & n.31 (listing states). So does the Internal Revenue Service. *See* I.R.S. Priv. Ltr. Rul. 200152012, 2001 WL 1659979 (Dec. 28, 2001) (finding the generation of electric energy constitutes production of tangible personal property).

In addition, there are states whose courts have found electricity is personal property for tax purposes. As one such court explained, focusing on the fact that electricity is produced by a "manufacturing process":

> Inasmuch as we have held, *the great weight of authority supports us, that the production of electricity by mechanical means involves a manufacturing process*, it is difficult to see how we could conclude that this process does not produce a product. *Certainly the manufacturing process does not produce a service*."

*Minn. Power & Light Co. v. Pers. Prop. Tax, Taxing Dist., City of Fraser, Sch. Dist. No. 695*, 182 N.W.2d 685, 692 (Minn. 1970) (emphases added).

As mentioned earlier, Oregon law also holds that electricity is "tangible personal property" for tax purposes. *See Powerex*, 346 P.3d at 491. In *Powerex*, the Oregon Supreme Court considered that issue for purposes of deciding whether Oregon could tax a percentage of an electricity wholesaler's total business income. *See id*. at 478-79. As the statute did not define "tangible personal property," the court engaged in classic statutory interpretation. *Id*. at 488-92. The court looked to the dictionary meaning of the phrase and also the context of the statute, which distinguished between tangible and intangible property (much like Section 503(b) distinguishes between "goods" and "services"). *Id*.

Ultimately, the court used a common sense analysis and rejected an overly scientific approach: "the scientific debate about the subatomic properties of electricity—as fascinating as it is—seems beside the point." *Id*. at 491. According

to the court, electricity is tangible personal property if the "property sold was perceptible to the senses, could be located physically within a state, and could be delivered or shipped to a place." *Id*. In finding electricity met those elements, the court found the "physical properties of electricity are what make it valuable to a purchaser, unlike intangible property, the value of which derives from the obligations and rights that the intangible property represents." *Id*. at 491-92.

>    d.    **The clear majority of products liability cases hold electricity is a product when delivered to a customer.**

The *Escalera* court also studied how electricity is characterized in state tort law and found that once electricity is delivered to a customer, it is held to be a product. 563 B.R. at 364-66. In products liability cases, whether electricity is a "product" for strict liability or a "service" is often litigated due to the personal injuries caused by high-voltage electricity. *See generally* Restatement (Second) of Torts § 402A (1965) ("One who sells any product in a defective condition … is subject to liability."). Important here, the term "product" is virtually synonymous with "goods." *Escalera*, 563 B.R. at 364; *see also Black's Law Dictionary* 1245 (8th ed. 2004) (defining "product" as "[s]omething that is distributed commercially for use or consumption."); *Black's Law Dictionary* 291 (8th ed. 2004) (defining "commodity" to "embrace[] only tangible goods, such as products").

The *Escalera* court concluded that the "clear majority of States considers electrical energy to be a 'product,' not a 'service' and, therefore, subject to the

31

framework of Restatement Section 402A for most purposes." 563 B.R. at 364; *see also Bryant v. Tri–Cnty. Elec. Membership Corp.*, 844 F. Supp. 347, 349, 350 n.6 (W.D. Ky. 1994) (collecting cases) ("[T]he majority of the state courts considering this issue have encountered little difficulty deciding that electricity is a product."). The Wisconsin Supreme Court explained the majority view well:

> While there probably are numerous technical definitions of 'electricity,' we need not be concerned with those accurate descriptions here suffice it to say *it is a form of energy that can be made or produced by men, confined, controlled, transmitted and distributed to be used as an energy source for heat, power and light and is distributed in the stream of commerce.*

*Ransome v. Wis. Elec. Power Co.*, 275 N.W.2d 641, 469 (Wis. 1979) (emphasis added). In *Ransome*, the court concluded: "The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product." *Id.*

In addition to its generation, distribution, and use, courts have found that electricity is subject to product liability rules because it is sold when it passes through the customer's meter. *Bryant*, 844 F. Supp. at 350 (explaining that once electricity passes through the meter, the charges are computed, the seller relinquishes control over its product, and the electricity is suitable for ordinary use). The passage of electricity through a customer's meter is also a critical distinction in the minority of products liability cases that find electricity is not a

product but a service. These cases consider electricity a service for tort purposes if the injuries are due to contact with high voltage wires *before* the electricity has been delivered to a customer.[8] *Escalera*, 563 B.R. at 365-66.

In the end, "[t]he general view holding electricity to be a 'product' sensibly accounts for the fact that electricity is created, harnessed, measured, transported, bought and sold, like products generally." *Bryant*, 844 F. Supp. at 352. Thus, the *Escalera* court was "unable to locate any legal authority under Restatement Section 402A suggesting that electrical energy actually metered and delivered to a customer is anything other than a 'product.'" 563 B.R. at 365-66.

State tort law provides another example of courts applying a common-sense analysis based on the well-settled nature of electricity to reach the conclusion that it is a consumable product and treated as goods.

> **e.    A strong majority of non-bankruptcy courts hold that electricity is "goods" under the UCC once it is metered and delivered to the customer.**

The final area of the law to consider is Article 2 of the UCC, which applies to "transactions in goods." Under the UCC, "goods" is defined as:

---

[8] The *Escalera* court addressed two decisions that represent the few cases that hold strict liability rules never apply to producers of electricity. *Escalera*, 563 B.R. at 365 n.30. One was from New York, *Farina v. Niagara Mohawk Power Corp.*, 81 A.D.2d 700, 438 N.Y.S.2d 645, 647 (1981), and one from Ohio, *Otte v. Dayton Power & Light Co.*, 523 N.E.2d 835 (Ohio 1988). Both, as explained in a moment, are outliers.

> all things (including specially manufactured goods)
> which are movable at the time of identification to the
> contract for sale other than the money in which the price
> is to be paid, investment securities (Article 8) and things
> in action.

UCC § 2-105(1); *see also* O.R.S. 72.1050. Many non-bankruptcy courts, both state

courts and federal courts sitting in diversity, have considered whether electricity

constitutes "goods" under that definition.

The *Escalera* court analyzed these cases too and found a strong majority

have determined electricity is "goods" under the UCC. 563 B.R. at 351-53 nn.7-14

(collecting and analyzing cases). As a bankruptcy court from this circuit explained:

"Simply put, electricity in this instance is a thing movable at the time of

identification to the contract for sale. … The electricity is moved through the

power lines and the amounts are metered and therefore identifiable." *In re Pac.*

*Gas & Elec. Co.*, 271 B.R. 626, 640 (N.D. Cal. 2002) (applying California law).

While a minority of state courts have disagreed and determined electricity is

not "goods" under the UCC, the *Escalera* court found that virtually all of these

cases involved claims of personal injury caused by contact with high voltage wires

*before* metering and the delivery of electricity to a customer. 563 B.R. at 352. That

obviously is not the situation here. Ultimately, after finding only one true outlier to

the majority rule (New York),[9] the *Escalera* court concluded: "other than in New York, the Court has been unable to locate any other state court precedent suggesting that electrical energy actually metered and delivered to a customer is anything other than 'goods' under UCC Section 2-105." *Id*. at 353.

Since *Escalera*, one of the states counted in the majority, Ohio, has clarified its position and found electricity is a service and not "goods" under the UCC. *See Yoby v. Cleveland*, 2020-Ohio-3366, 155 N.E.3d 258, 279 (Ohio Ct. App.). *Yoby* involved a class action lawsuit questioning whether a city was authorized to assess certain adjustments on customer's electric bills under an electrical service agreement. The city argued the UCC statute of limitations barred the plaintiffs' breach of contract claims. *Id*. The Ohio Court of Appeals disagreed, finding "electricity is a 'service' because it does not require a manufacturing process." *Id*. (citation omitted).

---

[9] The *Escalera* court included an analysis of New York's position that electricity is not "goods" under the UCC and found it originated from a single sentence in a personal injury case involving electricity prior to metering and delivery. 563 B.R. at 352-53 (discussing *Farina*, 81 A.D.2d 700, 438 N.Y.S.2d at 647). Subsequent cases followed *Farina*'s "inauspicious and analysis-free dicta" as controlling. *See id*. at 353. The *Escalera* court found *Farina* and its progeny unimpressive. *Id*.; *see also* New York City Bar Ass'n, Made in NY: Electricity (Mar. 2020). In any event, an earlier New York case held electricity is a commodity and a product that is manufactured, further dampening the precedential value of *Farina*. *See People ex rel. Brush Elec. Mfg. Co. v. Wemple*, 29 N.E. 808 (N.Y. 1892).

*Yoby* is an outlier too. It relied on *Otte v. Dayton Power & Light Co.*, 523

N.E.2d 835 (Ohio 1988), for its holding. *Otte* is a products liability case involving

stray voltage after it passed through the customer's meter. There the court found

that a distribution system for electricity was a service because electricity is not

manufactured. *Id*. at 838. *Otte* has been criticized by decisions such as *Powerex*,

346 P.3d at 492, and clearly does not reflect the majority view, *see Escalera*, 563

B.R. at 366 n.30; *Bryant*, 844 F. Supp. at 350 n.6.

Moreover, *Yoby* and *Otte*'s understanding that electricity does not require a

manufacturing process is clearly contrary to *Utah Power & Light*, *Ransome*, and

the other courts cited above that have expressly recognized that electric utilities

such as PacifiCorp manufacture electricity. Plus there is no dispute that PacifiCorp

generated the electricity that NORPAC requested and used. 2-ER-151 (¶ 18). Even

so, as the *Escalera* court observed, "the strong majority of UCC case law supports

the classification of electrical energy that has been metered and delivered to a

customer as 'goods.'" 563 B.R. at 360.

> **f.    Bankruptcy courts are split on whether electricity is "goods" under the UCC and Section 503(b)(9).**

And then there are the bankruptcy courts considering whether electricity

constitutes "goods" under Section 503(b)(9). Each has applied the UCC definition

of "goods." *See Escalera*, 563 B.R. at 349-50. One reason is the constitutional

mandate for uniformity of bankruptcy laws. As one court reasoned, "the UCC

36

111359128.14 0025000-01020

definition will support uniformity because forty-nine states have adopted some version of the UCC." *GFI Wis.*, 440 B.R. at 797; *see also Escalera*, 563 B.R. at 350 (adopting UCC § 2-105's definition of "goods" as the principal legal definition for purposes of Section 503(b)(9) because "the UCC purports to be a uniform law in the United States"); *In re Cir. City Stores, Inc.*, 416 B.R. 531, 535 (Bankr. E.D. Va. 2009) ("The Court does not believe that Congress intended a disparate application of the term 'goods,' but rather contemplated a consistent, uniform approach to its interpretation.").

But despite seeking uniformity—and examining the same definition and the same thing—decisions from bankruptcy courts are anything but uniform. Including the decision in our case, bankruptcy courts are split on whether electricity is "goods" under Section 503(b)(9) using the UCC definition. Half have found electricity is "goods." This view is held by *Escalera*, among other decisions.[10] *See* 563 B.R. at 369-70. The *Escalera* line of cases holds that electricity is "goods" because it is moveable, tangible, and consumable; is bought and sold in the marketplace; is identified as it passes through the customer's meter; and is moveable when it is identified. *Id*. at 354-55, 358-60, 369-70; *GFI Wis.*, 440 B.R.

---

[10] *See also In re Erving Indus., Inc.*, 432 B.R. 354 (Bankr. D. Mass. 2010); *GFI Wis.*, 440 B.R. at 799-801 (affirming *In re Grede Foundries, Inc.*, 435 B.R. 593 (Bankr. W.D. Wis. 2010)); *In re S. Mont. Elec. Generation & Transmission Coop., Inc.*, No. 11-62031-11, 2013 WL 85162 (Bankr. D. Mont. Jan. 8, 2013); *In re Wometco de P.R. Inc.*, No. 15–02264, 2015 WL 1533893 (Bankr. D.P.R. 2016).

at 800-01; *S. Mont. Elec. Generation & Transmission Coop., Inc.*, No. 11-62031-11, 2013 WL 85162, at *4-5 (Bankr. D. Mont. Jan. 8, 2013).

This line of cases promotes a common sense, practical approach, consistent with decisions such as *Utah Power & Light*, *Town of Concord*, and *Ransome*, and the strong majority of non-bankruptcy courts that hold electricity is "goods" under the UCC. *GFI Wisconsin* explained this approach. There the court observed that "the meaning of 'goods' under the UCC should not depend on quantum physics, how fast electrons are moving at a particular time or even where a debtor's meter is located on an electrical circuit" for the purpose of determining administrative priority under the Bankruptcy Code. 440 B.R. at 799-800.

Rather:

> determining whether a particular thing qualifies as a good and deserves administrative priority should be a *straightforward assessment, taking into consideration the nature and common understanding of the thing*, but also considering its similarities to goods that fall undisputedly under the UCC and would receive administrative priority under § 503(b)(9).

*Id*. at 800 (emphasis added). The *Escalera* court undertook a similar analysis: "stepping aside from the physics, a common-sense interpretation of UCC Section 2–105 dictates that electrical energy meets the criteria. It is a thing that exists, can be identified, and is capable of being sold." 563 B.R. at 360; *see also Pac. Gas & Elec.,* 271 B.R. at 640 ("[E]lectricity is moved through the power lines and the

amounts are metered and therefore identifiable.").

The remaining bankruptcy courts considering the issue, most recently in *Great Atlantic*, 538 B.R. at 673-74, hold that electricity is not "goods" under Section 503(b)(9).[11] The *Great Atlantic* line of cases focus on the nature of the meter, the extreme speed at which electricity travels through the meter, and the limitations of metering technology. These courts hold that electricity is not movable at the time of identification to the contract. As one such court reasoned, "[o]nce electricity has been 'identified' by measurement at the meter, it has already been consumed by the end user." *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 239 (Bankr. N.D. Tex. 2009).

The court in *Great Atlantic* explained it this way: the identification of electricity to the contract occurs after consumption because electricity moves so fast through the meter to the end device that it is consumed milliseconds before the meter is able to register and display the amount used. 538 B.R. at 671-73. Together, the *Great Atlantic* line of cases and the small minority of non-bankruptcy courts finding electricity is not "goods" under the UCC still constitute a small minority.

---

[11] *See also In re Samaritan All., LLC*, No. 07-50735, 2008 WL 2520107 (Bankr. E.D. Ky. 2008); *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 239 (Bankr. N.D. Tex. 2009); *In re NE Opco, Inc.*, 501 B.R. 233 (Bankr. D. Del. 2013).

111359128.14 0025000-01020

3.     **The Court should reverse the bankruptcy court's order for failure to consider and apply the ordinary and common meaning of "goods."**

Despite the overwhelming authority that holds electricity fits within the established ordinary and common meaning of "goods," the bankruptcy court sided with *Great Atlantic* without adhering to the basic tenets of statutory construction. The bankruptcy court did not start with the language and context of Section 503(b)(9), interpreting "goods" according to the term's ordinary and common meaning. Rather the bankruptcy court jumped directly and solely to the UCC definition of "goods," ironically because "uniformity is important when interpreting federal statutory law." 1-ER-11.

Doing so, the bankruptcy court completely failed to consider that electricity fits within the ordinary meaning of "goods," the many areas of federal and state law that treat electricity as a good and tangible personal property that is manufactured and delivered to a customer who agrees to pay what the meter says. Even more damning, the bankruptcy court failed to consider the strong majority of non-bankruptcy courts that have determined electricity when metered is a "product" for purposes of products liability and "goods" for purposes of the UCC. It would be incongruous to hold that electricity is goods or a product for those purposes but "services" for purposes of Section 503(b)(9).

Without question, the bankruptcy court's alignment with *Great Atlantic* failed to achieve the uniformity mandated by the Constitution. Had the court considered the meaning of "goods" from authorities other than *Great Atlantic* and attempted to find and employ the term's ordinary and common meaning, it would have found that the overwhelming weight of authority treats electricity as "goods" and engages in a less-mechanical inquiry that actually looks to the underlying nature and properties of electricity, rather than basing the decision entirely on the nature and limitations of the meter.

Moreover, if electric utilities such as PacifiCorp are forced to bear the burdens of having the electricity they generate and deliver deemed goods and a product, they should also gain the benefits. Electric utilities find themselves liable under federal statutes because they produce goods, for income taxes because they sell tangible personal property, and in strict liability in tort because they sell products. They also find themselves subject to warranties and other assurances under the UCC. It would be inequitable to not provide them with the upside benefit of having electricity being deemed "goods" for Section 503(b)(9) purposes.

Since the bankruptcy court was charged with interpreting "goods" for purposes of Section 503(b)(9), it should have considered and applied the ordinary meaning of the term. It erred when it did not. The Court should reverse the

bankruptcy court's order, apply the ordinary meaning of "goods" for purposes of Section 503(b)(9), and allow PacifiCorp's administrative claim to proceed.

**III.    The bankruptcy court erred in finding electricity is not "goods" under the UCC.**

Even if the Court finds the bankruptcy court did not err in failing to consider and apply the ordinary meaning of "goods," the bankruptcy court still erred. Following *Great Atlantic*, the bankruptcy court necessarily adopted a strained interpretation of the UCC. Identification to the contract does not require the meter to register and display the amount of electricity consumed. Rather it requires a common-sense, practical analysis that focuses on the underlying nature of electricity and the parties' transaction, not one that turns on the millisecond delay between measurement and consumption.

**A.    Electricity is movable and the amount of electricity the customer uses is measured and identified by the meter.**

There was no dispute before the bankruptcy court that PacifiCorp supplied NORPAC with electricity and that electricity is movable. 1-ER-11-12. Indeed, the courts considering the issue have held that electricity is movable. *See*, *e.g.*, *GFI Wis.*, 440 B.R. at 799 ("[A]lthough the movement of electricity may be rapid and subatomic … an electric current is literally moving through the transmission network and continues to move until it is delivered to a customer *at the time* it is metered or consumed." (emphasis in original)); *In re Erving Industries, Inc.*, 432

B.R. 354, 369 (Bankr. D. Mass. 2010) (holding that electricity easily meets the movability requirement).

In addition, the parties agreed that NORPAC's meters measure and record the amount of electricity passing through the meter and that NORPAC is required to pay for. 1-ER-12. The only reason an electricity meter exists is to measure and identify the amount of electricity consumed for the purpose of billing the customer. 2-ER-152 (¶ 21); *see also* 2-ER-184 (¶ 10) ("The accounts are each associated with a total of seven meters …, each of which measure and identify the amount of electrical energy used by the Debtor, as required to determine the appropriate charge for the electrical energy as determined by applicable rate schedules.").

**B.    The bankruptcy court incorrectly held that electricity is identified to the contract when it is registered and displayed by the meter.**

**1.    Electricity is "goods" because it is "movable at the time of identification to the contract."**

As there is no dispute that electricity is movable and can be identified, the question before the bankruptcy court became whether the electricity NORPAC received from PacifiCorp was movable at the time of identification to the contract. *See* 1-ER-12. According to the bankruptcy court, the question boiled down to identification: is electricity identified when it passes through the meter or when the meter fully registers and displays the amount of electricity consumed? 1-ER-12-13.

111359128.14 0025000-01020

If the former, electricity is movable when identified and is "goods" under the UCC. *Id*. If the latter, electricity is not movable when identified and is not "goods." *Id*.

In following decisions such as *Great Atlantic*, the bankruptcy court found electricity is not movable at the time of identification because the meter is unable to immediately register and display the electricity passing through it and when used by the consumer. 1-ER-12-18. As noted (at p. 9), electricity travels at tremendous rates of speed (almost 186,000 miles per second) and is typically consumed within 226 nanoseconds after passing through the meter. The meter cannot register and display the amount of electricity passing through it within that time but rather milliseconds later.

Thus the bankruptcy court reasoned that the millisecond lag between the time the meter registers and displays the amount of electricity passing through it and the usage of the electricity means that it, having been consumed, is no longer movable. *Id*. The bankruptcy court also found that, "[a]rguably, identification happened even later than that, when the meters were actually read." 1-ER-15-16 n.11. The UCC, however, does not define "identification" so narrowly or so precisely. One reason is that the "definition of goods is based on the concept of movability." UCC § 2-105, cmt. 1. Another is that the purpose of identification is to fix the point at which the buyer has a property interest in the goods. *In re Tacoma Boatbuilding Co.*, 158 B.R. 19, 23 (S.D.N.Y. 1993).

44

Thus, identification is simply the process that transforms unascertained goods into specific goods so that they become the goods to which the contract refers. *In re Ashby Enters., Ltd.*, 262 B.R. 905, 912 (Bankr. D. Md. 2001). And under the UCC, it is possible "for the identification to be tentative or contingent. In view of the limited effect given to identification by this Article, *the general policy is to resolve all doubts in favor of identification*." UCC § 2-501, cmt. 2 (emphasis added); *see also* O.R.S. 72.5010. Further, there is no necessity that goods be in a deliverable state or that all of the seller's duties with respect to the processing of the goods be completed in order that identification occur. UCC § 2-501, cmt. 4.

It follows that identification can occur in various ways. *See* UCC § 2-501. One way is that "identification can be made at any time and in any manner explicitly agreed to by the parties." *Id*.; *see also id.*, cmt. 1 ("Generally speaking, identification may be made in any manner 'explicitly agreed to' by the parties."). Identification is also made when the contract is made if it is for the sale of goods already existing and identified or if the contract is for the sale of future goods, when the goods are shipped, marked, or otherwise designated by the seller as the goods to which the contract refers. UCC § 2-501(1).

Here, the parties explicitly agreed that the meter would measure and identify the electricity PacifiCorp supplied and NORPAC received. That was the identification contemplated by the parties. PacifiCorp is required to supply

electricity to NORPAC upon request, and having requested electricity, NORPAC

agreed to buy the electricity it used under OPUC rate schedules as measured by the

seven meters at its Stayton, Oregon plant. *See* 2-ER-151-53 (¶¶ 17-23), 184 (¶ 10),

264-70. And once electricity passed through the meters, there was no confusion.

The meters can only measure the electricity passing through them to determine the

value to the parties. *See* 1-ER-12. Further, whether electricity is viewed as existing

or future goods, it was identifiable as movable before the parties' contract was

formed based the parties' arrangement, as dictated by Oregon law.

The bankruptcy court erred finding electricity is not movable when

identified.

### 2. The bankruptcy court failed to resolve all doubts in favor of identification and follow the UCC's policies to simplify, clarify, and make the law uniform.

Even so, to the extent the bankruptcy court decided to apply the UCC

definition of "goods," it must have considered the policies underlying the UCC.

That includes the general policy to resolve *all doubts* in favor of identification.

UCC § 2-501, cmt. 2. It also includes following the general rule of construction

that the UCC "shall be liberally construed and applied to promote its underlying

purposes and policies." *See Bank of the W. v. Com. Credit Fin. Servs., Inc.*, 852

F.2d 1162, 1172 (9th Cir. 1988) (citation omitted) ("The [UCC] is intended to be

flexible."). Those policies include "to *simplify*, *clarify*, and modernize the law

46

governing commercial transactions" and "to make *uniform the law among the various jurisdictions*." UCC § 1-103(a) (emphases added); *see also* O.R.S. 71.1030(1).

The bankruptcy court's decision followed none of the UCC's policies and accomplished none its goals. Not only did the bankruptcy court ignore the uniformity offered by the strong majority of non-bankruptcy cases that have determined electricity is "goods" under the UCC when it is metered and delivered, the court followed the *Great Atlantic* line of cases, which are anything but uniform, even amongst themselves. These cases add new conditions to the UCC definition of "goods" that do not exist and that go far beyond the plain language of the UCC.

For instance, in *Pilgrim's Pride*, the court found that the UCC definition of "goods" was not intended to "include things which cannot be packaged and handled." 421 B.R. at 239. That, of course, is contrary the many non-bankruptcy cases that recognize otherwise. *See Escalera*, 563 B.R. at 357-58. In *In re NE Opco, Inc.*, 501 B.R. 233, 250 (Bankr. D. Del. 2013), the court announced that "there must be a period between when electricity is identifiable and consumed. … the period between identification and consumption must be meaningful." That too is unsupported, as there is no such requirement included in the UCC. *See Escalera*, 563 B.R. at 356, 358 ("the novel time interval concept is nowhere to be found in UCC Section 2-105"). And again in *Great Atlantic*, the court parsed identification

47

by the milliseconds it takes the meter to register and display after electricity has been used. 538 B.R. at 672-73.

The bankruptcy court justified its reliance on *Great Atlantic* on the grounds that "[s]omething cannot be identified until it is capable of perception," that electricity may be "identifiable" once it passes through the meter but it is not "identified," and that "identification is impossible until, at the earliest, the quantity of electricity delivered is registered and displayed on the meter." 1-ER-14-15. Such reasoning fails to recognize that identification can be made at any time and in any manner explicitly agreed to by the parties. UCC § 2-501(1). It also does not comport with the "limited function of identification" or the UCC's policy to resolve all doubts in favor of identification. UCC § 2-501, cmt. 2; UCC § 1-103(a).

And neither *Great Atlantic* nor the bankruptcy court's analysis simplifies or clarifies the law. Their logic is not based on the physical nature of electricity as a thing that is generated and bought and sold in the marketplace as a consumable product but rests on how fast the meter can register and display the electricity used or how soon the meter is read. In effect, the bankruptcy court's hyper-technical reading of "identification" will change with the meter's technology. If all doubts should be resolved in favor of identification, the technological limits of the meter or when the meter is read does not matter.

On the other hand, courts such as *Escalera* that have looked to the plain meaning of the UCC definition of "goods" did not invent such technicalities or conditions in concluding that electricity is movable at the time it is identified at the customer's meter. *See, e.g.*, *Escalera*, 563 B.R. at 360 (holding that electricity "is measured as it passes through a meter" and that a meter is "not read every nanosecond" but that the utility instead reads the meter periodically). The simple, clear, and uniform analysis holds that "electricity is moved through the power lines and the amounts are metered and therefore identifiable." *Pac. Gas & Elec.*, 271 B.R. at 640; *see also Erving*, 432 B.R. at 370 ("Like movability, the identifiability of electricity is subject to little debate.... Courts have generally held that electricity is identifiable because it can be measured at the point it passes through the meter ... and this Court agrees.").

The bankruptcy court erred in holding otherwise.

## C.    The bankruptcy court failed to take into account that water and natural gas are considered "goods" under the UCC.

There is also another reason why the electricity NORPAC received is "goods" under the UCC: to promote uniformity in the sale of all utilities, namely electricity, water, and natural gas. Since "[m]ost cases dealing with other utilities, such as gas and water, conclude that they are goods, … [r]eaching the same result with electric utility contracts accomplishes the objective of uniformity in public utility transactions." 3 *Sales & Bulk Transfers Under the UCC* § 1.03, Lexis

(2021). The bankruptcy court, however, found that "the analogy of electricity to natural gas and water is not apt or useful." 1-ER-16.

That too was error. As one bankruptcy court has observed, "electrical flow is more difficult to conceptualize than flow of a substance such as water or natural gas," and that is perhaps why some courts have had no trouble finding natural gas and water are "goods" but characterize electricity as a service. *In re Grede Foundries, Inc.*, 435 B.R. 593, 596 (Bankr. W.D. Wis. 2010). "Nonetheless," the court continued, "there is no principled distinction to be made between natural gas, water, or electricity. Regardless of how big the particle or how fast it moves, it is a good if moveable at the time of identification." *Id*.

Despite the comparisons, some courts, like the bankruptcy court, have tried to deemphasize the similarities because water and natural gas are commonly considered goods under Section 2-107 of the UCC, and electricity is not. *See, e.g.*, 1-ER-16-17; *Pilgrim's Pride*, 421 B.R. at 240-42. That ignores that courts have also found that water is "goods" under UCC § 2-105. *See, e.g.*, *Zepp v. Mayor & Council of Athens*, 348 S.E.2d 673, 677-78 (Ga. Ct. App. 1986); *Dakota Pork Indus. v. City of Huron*, 638 N.W.2d 884, 886 (S.D. 2002). *But see Coast Laundry, Inc. v. Lincoln City*, 497 P.2d 1224, 1227-28 (Or. Ct. App. 1972) (finding that the sale of water is not subject to the UCC's implied warranties presumably because water is not a good subject to the UCC).

Thus a comparison of electricity to water and natural gas, which are each considered "goods" under the UCC in their own right, provides further support that electricity is also "goods." Having failed to properly interpret "goods" under the UCC for this and the other reasons explained above, the Court should reverse the bankruptcy court's order holding that electricity is not "goods" for purposes of Section 503(b)(9) and allow PacifiCorp's administrative expense claim.

## IV. The bankruptcy court erred in interpreting "goods" under Section 503(b)(9) strictly and narrowly.

"When the statute's language is plain, the sole function of the courts … is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (cleaned up). Moreover, where the words of a statute are unambiguous, the courts must determine the plain meaning of "goods" without resorting to any principles of narrow construction. *See Escalera*, 563 B.R. at 347. Yet the bankruptcy court failed to do so here. *See* 1-ER-10, 18.

According to the bankruptcy court, it was "far from clear" whether the electricity NORPAC received from PacifiCorp qualified as "goods" under Section 503(b)(9). 1-ER-18. And because any doubt about the proper characterization of the claim should be resolved consistent with the Bankruptcy Code's "equal distribution aim," the provision should be strictly construed. *Id*. (citation omitted). While it is true that priority statutes should be "tightly construed" under certain

circumstances, this principle only applies when it is "far from clear" that the

asserted priority fits within the language of the statute. *Howard Delivery Serv., Inc.*

*v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667, 668 (2006).

As explained above, that situation is not present here. That electricity falls

within the ordinary meaning of "goods" is well recognized; it cannot be

characterized as "far from clear." *See Escalera*, 563 B.R. at 372-73. Courts "should

not find an ambiguity where there is none or make policy decisions to limit the

application of Bankruptcy Code provisions when the language of the statute is

otherwise clear." *Erving*, 432 B.R. at 374.

Moreover, in narrowly construing Section 503(b)(9), the bankruptcy court

chose to narrowly construe the UCC, which does not call for such treatment. As

explained (on pp. 46-47), the UCC must be liberally construed and is intended to

be flexible, and in particular, all doubts must be resolved in favor of identification.

By choosing to apply the UCC definition of "goods," the bankruptcy court should

have likewise applied its policies. Also finding it "far from clear" that electricity

qualifies as "goods," the bankruptcy court should have resolved its doubts in favor

of identification, rather than apply a narrow or overly technical interpretation.

It follows that when interpreting Section 503(b)(9), the bankruptcy court

should have only looked for the ordinary meaning of "goods" and applied "the law

as written and not put a judicially created obstacle in the path of an administrative

expense claimant." *NE Opco*, 501 B.R. at 256; *see also Escalera*, 563 B.R. at 372-73. Because narrow construction principles have no bearing on the bankruptcy court's analysis, the only question before the court was whether electricity NORPAC received is "goods" for purposes of Section 503(b)(9). And electricity fits uniformly within the ordinary and common meaning of "goods."

This is an alternative reason for the Court to reverse the bankruptcy court and allow PacifiCorp's administrative expense claim.

## CONCLUSION

PacifiCorp respectfully requests that this Court reverse the bankruptcy court's order granting NORPAC's objection and allow its 503(b)(9) claim in the amount of $202,937.26 to proceed. The bankruptcy court erred in considering only the UCC definition of "goods," to the exclusion of the overwhelming majority of authorities that recognize electricity fits within the ordinary meaning of "goods."

The bankruptcy court also failed to properly apply the concept of identification under the UCC and improperly tipped the scale against PacifiCorp based on narrow construction principles. Given the undeniable purpose of the meter and the parties' agreement that NORPAC would pay PacifiCorp's rates based on the meter readings, the electricity NORPAC received was movable when identified to the parties' contract.

Because electricity meets the ordinary and common meaning of "goods" for purposes of Section 503(b)(9), PacifiCorp's administrative expense claim should be allowed and remand is required for the bankruptcy court to determine the value of the electricity PacifiCorp supplied and NORPAC received in the 20 days before bankruptcy.

DATED:  August 17, 2021.

STOEL RIVES LLP

*/s/ W. Christopher Pooser*
Oren B. Haker, OSB No. 130162
Bryan T. Glover (*pro hac vice* granted)
W. Christopher Pooser (*pro hac vice* granted)

*Attorneys for Appellant PacifiCorp, dba Pacific Power & Light*

54

## CERTIFICATE OF COMPLIANCE

This brief contains 12,850 words, excluding the items exempted by Fed. R.

Bankr. P. 8015(a)(7)(B)(iii). I certify that this brief complies with the type-volume

limit of Rule 8015(a)(7)(B).

DATED:  August 17, 2021.

STOEL RIVES LLP

*/s/ W. Christopher Pooser*
Oren B. Haker, OSB No. 130162
Bryan T. Glover (*pro hac vice* granted)
W. Christopher Pooser (*pro hac vice* granted)

*Attorneys for Appellant PacifiCorp, dba Pacific Power & Light*

111359128.14 0025000-01020

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the date below, I caused to be electronically filed APPELLANT'S BRIEF with the Clerk of Court using the CM/ECF system, which will in turn automatically generate a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF system.

I further certify that on the date below, I served a copy of the above-referenced document on Danny Newman at Tonkon Torp LLP, via email address danny.newman@tonkon.com.

DATED:  August 17, 2021.

*/s/ Hillary Bibb*
Hillary Bibb